IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

ALONZO PATRICK                 :            CIVIL ACTION
                               :
        v.                     :
                               :
JO ANNE B. BARNHART, et al.    :            NO.  04-4968


## REPORT AND RECOMMENDATION

M. FAITH ANGELL                                    March 6, 2006
CHIEF UNITED STATES MAGISTRATE JUDGE

## I. INTRODUCTION.

This is an action brought pursuant to 42 U.S.C. § 405(g) seeking judicial review of a final

decision of the Commissioner of the Social Security Administration ("Commissioner") denying

Plaintiff's claim for supplemental security income ("SSI") under Title XVI of the Social Security

Act.  Presently before this Court are the parties' pleadings, including a Joint Statement of

Undisputed Facts, Plaintiff's objections to specific ALJ findings in the Commissioner's decision,

and the Commissioner's response thereto (as Ordered by me on July 8, 2005).[1]

On October 27, 2005, counsel presented oral argument.

---

[1] Consistent with an earlier Procedural Order, the Record, a Complaint, an Answer and
cross-Motions for Summary Judgment have been filed in this action.

## II.  BACKGROUND AND PROCEDURAL HISTORY.[2]

Plaintiff was born on February 14, 1961.  He graduated from high school and has no past relevant work history.  Plaintiff alleges an onset disability date of December 16, 1997, arguing that he is disabled as a result of a seizure disorder.

Plaintiff filed an application for SSI benefits on October 9, 2001.[3]  The Commissioner denied Plaintiff's claim initially.  Following the denial at the initial level, Plaintiff requested a hearing before an Administrative Law Judge.  A hearing was held on October 30, 2002 before ALJ William J. Reddy in Philadelphia.  In a November 27, 2002, the ALJ determined that Plaintiff is ineligible for SSI benefits.

Plaintiff sought review by the Appeals Council.  In an August 18, 2004 decision, the Appeals Council upheld the ALJ's November 27, 2002 decision.

On October 22, 2004, Plaintiff filed this action alleging that the Commissioner's final decision denying SSI benefits is not supported by substantial evidence.

## III.  SOCIAL SECURITY DISABILITY LAW.

### A.  Disability Determinations.

The Social Security Act authorizes several classes of disability benefits, including SSI benefits.  In order to qualify for SSI benefits, a person must be "disabled" under the Social Security Act and the accompanying regulations.

---

[2]      Many of the facts in this section are drawn from Plaintiff's Clear and Concise Statement of Facts [Docket Entry No. 16], and are undisputed by the Defendant.  Where facts are drawn from the undisputed statement of facts, I will omit citations to the Record.

[3]      Plaintiff previously filed applications for SSI in December 1997, March 1999, and January 2000.  All were denied.  *Administrative Record* ["Record"] at 21.

To establish a disability under the Social Security Act, a claimant must demonstrate that there is some "medically determinable basis for an impairment that prevents him from engaging in any `substantial gainful activity' for a statutory twelve-month period." *Fargnoli v. Massanari*, 247 F.3d 34, 38-39 (3d Cir. 2001) (*quoting*, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir.1999)); 42 U.S.C. § 423(d)(1)(1982).  A claimant can establish a disability in either of two ways: (1) by producing medical evidence that one is disabled per se as a result of meeting or equaling certain listed impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1 (2000), or (2) by demonstrating an impairment of such severity as to be unable to engage in any kind of substantial gainful work which exists in the national economy.  *Heckler v. Campbell*, 461 U.S. 458, 460 (1983); 42 U.S.C. § 423(d)(2)(A).

The Commissioner's regulations provide a five (5) step sequential evaluation process for determining whether or not a claimant is under a disability.  20 C.F.R. § 404.1520.  Step 1 states that an individual who is working will not be found to be disabled regardless of medical findings. 20 C.F.R. § 404.1520(b).  Step 2 involves evaluating severe impairments.  20 C.F.R. § 404.1520( c).  Step 3 requires determining whether the claimant has an impairment or combination of impairments which meets or equals a listed impairment in Appendix 1. 20 C.F.R. § 404.1520(d).  Step 4 states that if an individual is capable of performing past relevant work, he will not be found to be disabled.  20 C.F.R. § 404.1520(e).  Step 5 requires that if an individual cannot perform past relevant work, other factors must be considered to determine if other work in the national economy can be performed.  20 C.F.R. § 404.1520(f).  *See e.g.*, *Ramirez v. Barnhart*, 372 F.3d 546, 550-51 (3d Cir. 2004).

It is the ALJ's responsibility to resolve conflicts in the evidence and to determine credibility and the relative weights to be given to the evidence. *Plummer v. Apfel*, 186 F.3d at 429 (3d Cir. 1999); *Mason v. Shalala*, 994 F.2d 1058, 1066 (3d Cir. 1993).  The ALJ's conclusions must be accepted unless they are without basis in the record.  *Torres v. Harris*, 494 F. Supp. 297, 301 (E.D. Pa. 1980), *aff'd*, 659 F.2d 1071 (3d Cir. 1981).

### **B.  Judicial Review of Disability Decisions**.

The role of this court on judicial review is to determine whether there is substantial evidence to support the Commissioner's decision.  *Fargnoli v. Massanari*, 247 F.3d at 38 (3d Cir. 2001); *Knepp v. Apfel*, 204 F.3d 78, 84 (3d Cir. 2000).  Substantial evidence is defined as the relevant evidence which a reasonable mind might accept as adequate to support a conclusion. *Pierce v. Underwood*, 487 U.S. 552, 565 (1988); *Morales v. Apfel*, 225 F.3d 310, 316 (3d Cir. 2000).  It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance of the evidence.  *Id.*

It is not the role of the Court to re-weigh the evidence of Record or substitute its own conclusions for that of the ALJ.  *See e.g., Burns v. Barnhart*, 312 F.3d 113, 118 (3d Cir. 2002).  Upon appeal to this Court, the Secretary's factual determinations, if supported by substantial evidence, shall be conclusive.  The conclusiveness applies both to findings of fact and to inferences reasonably drawn from that evidence.  *See Fargnoli v. Massanari*, 247 F.3d at 38 (3d Cir. 2001) ("Where the ALJ's findings of fact are supported by substantial evidence, we are bound by those findings, even if we would have decided the factual inquiry differently.").

**IV.  THE ALJ'S DECISION.**

The ALJ received medical evidence, including a consultative psychological evaluation, heard Plaintiff's testimony, and received testimony from a vocational expert and a psychiatric medical expert.  Proceeding through the five-step evaluation process, the ALJ determined that Plaintiff is a younger individual with a high school education.  While Plaintiff had performed some past work activity (as a cook in a nursing home, in a factory plucking chickens and doing maintenance-janitorial work), none was shown to qualify as past relevant work as defined by the Social Security Regulations.  *Record* at 22.

The medical records showed that in June 1996, Plaintiff received emergency treatment for head injuries sustained when he was hit with a baseball bat.  He began experiencing seizures shortly thereafter.  *Record* at 23.

The ALJ found that Plaintiff has a seizure disorder as well as a substance abuse disorder, and that these are severe impairments which cause more than a minimal impact on his ability to work.  *Record* at 25.  Plaintiff's treating physicians have prescribed anticonvulsant medications to control his seizure disorder and have instructed him to abstain from alcohol and illicit drug use.  Plaintiff has failed, without justifiable reason, to abstain from alcohol and illicit drug use and to take the prescribed dosages of anticonvulsant medication.  *Record* at 25, 28.

The ALJ determined that in combination, Plaintiff's seizure disorder, substance abuse, and noncompliance with prescribed medication result in major motor convulsive seizures with loss of consciousness occurring more frequently than once per month. His impairments, therefore, meet the requirements of Listing 11.02, Appendix 1, Regulations No. 4 (Epilepsy - major motor seizures).  However, in addition to finding that Plaintiff has a severe seizure

disorder, the ALJ also found that Plaintiff has a severe substance abuse disorder, and that his substance abuse is a material factor in his disability.  But for claimant's substance abuse, his major motor seizures would occur less frequently than once per month, and his seizure disorder would not meet the criteria of Listing 11.02, or any other listing.  *Record* at 25, 27-29.

While there is "some evidence of petit mal seizure activity," the ALJ found this evidence not convincing and determined that Plaintiff's seizure disorder does not meet Listing 11.03 (Epilepsy, minor motor seizures).  *Record* at 25.

The ALJ determined that Plaintiff does not meet the criteria of Listing 12.05C or D (Mental Retardation).  While Plaintiff reported an IQ score of 64, the record did not reflect significantly subaverage general intellectual functioning with deficits in adaptive functioning as required by this listing.  *Id.*

The ALJ concluded that if the effects of substance abuse are not considered, <u>or</u> if Plaintiff followed his doctors orders by abstaining from alcohol and illicit drug use and by taking his prescribed dosages of anticonvulsant medication, he would retain the residual functional capacity to perform medium work activity (i.e., work that requires lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds), reduced by: the need to avoid hazards such as unprotected heights and moving machinery; the complete inability to climb ladders, ropes and scaffolds; the inability to balance, or climb stairs, more than occasionally; and the need to avoid concentrated (frequent) exposure to noise, vibration, fumes, odors, dust, gases, and poor ventilation.  There are a significant number of medium work activity jobs in the regional and national economies that Plaintiff could perform if the effects of

substance abuse are not considered, or if the claimant followed his doctors orders by abstaining from alcohol and illicit drug use and taking his prescribed dosages of anticonvulsant medication. *Record* at 25-26.

The ALJ found Plaintiff's statements concerning his impairments and their effect on his ability to work credible **only** to the extent that they are consistent with the inability to perform substantial gainful activity due to substance abuse as well as the failure to follow prescribed treatment.  *Record* at 28.

The ALJ rejected the argument of Plaintiff's counsel that there is an exception in the drug and alcohol use provisions of the Social Security Act when it is alleged that the claimant's substance abuse is secondary to, or caused by, a separate disorder.  He also rejected counsel's argument that there are not a significant number of jobs that Plaintiff could perform, given his IQ of less than 80 and the effects of his head injury, noting that Plaintiff had performed work in the past as an institutional cook (skilled work), and after his head injury as a maintenance-janitor (semi-skilled work).  *Record* at 26-27.

According to the ALJ, Plaintiff is unable to perform substantial gainful activity, however, his substance abuse is a contributing factor material to his disability, and his disability results from his non-justified failure to follow prescribed treatment.  As a result, Plaintiff is not disabled as defined by the Social Security Act at any time through the date of the decision.  *Record* at 22, 27.

## V.  DISCUSSION

Plaintiff argues that the ALJ erred in finding his impairments did not meet or equal

listings 12.05C and 11.02 of the listings of impairments; in not including his IQ and frontal lobe

injury in the hypothetical presented to the vocational expert; and in finding his alcohol use

material to a finding of disability.  *Plaintiff's Motion for Summary Judgment* [Docket Entry No.

8] at pp. 14-18.

### A.  Assessment of Plaintiff's Impairments.

#### 1.  Listing 12.05.

To establish disability under Listing 12.05, a claimant must have significantly subaverage

general intellectual functioning with deficits in adaptive functioning initially manifested before

age 22.  20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05.  Under Listing 12.05C, the required severity

for this disorder is met by

> a valid verbal, performance, or full scale IQ of 60 through 70 and a physical or
> other mental impairment imposing additional and significant work-related
> limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §12.05C.

Plaintiff argues that he meets Listing 12.05C based upon his IQ score of 64 and a

showing of the required work related limitation of functioning and failure of adaptive functioning

before the age of 22.  In support of his argument, Plaintiff cites to his seizure disorder and his

high school records which reflect excessive absences, fair work habits and attitude and very poor

grades.  *Plaintiff's Motion for Summary Judgment* at p. 15.

Plaintiff contends that the medical evidence establishes that he suffers from multiple seizures, and argues, assuming *arguendo* it was determined that he failed to follow his prescribed treatment under 20 C.F.R. §416.930( c), that the ALJ erred in failing to consider his mental impairments (seizure disorder, 64 IQ score, and brain injury) in determining that there is no justification for Plaintiff's failure to follow the course of treatment that his treating physicians have prescribed for his seizure disorder. *Plaintiff's Motion for Summary Judgment* at pp. 15-16.

The ALJ found, based on the testimony of Milton Alter, M.D., the psychiatric medical expert who appeared and testified at Plaintiff's hearing, that although Plaintiff's reported IQ of 64 would meet the criteria of Listing 12.05C or D, the record did not reflect significantly subaverage general intellectual functioning with deficits in adaptive functioning as is required to meet this listing. The ALJ noted that Plaintiff had performed skilled work before his head injury and semi-skilled work after. *Record* at 25.

At the October 30, 2002 hearing, Dr. Alter initially testified that Plaintiff's IQ scores were in the subnormal to low normal category, and that the damage to his frontal lobe after he was hit with a baseball bat in 1996 would lower Plaintiff's ability to perform even more. *Record* at 71-72. Dr. Alter further testified that Plaintiff's IQ scores were consistent with Dr. Iqbal's notes which suggested a life-long subnormal mental capacity, and that he believed the scores to be valid. *Record* at 64, 71. Dr. Alter noted, however, that Plaintiff did attend Special Education classes and finished twelfth grade, and that nowhere else in the record did anyone allude to Plaintiff's borderline or lower level intellectual functioning, which would certainly impact his ability to work in general. *Id.*

After hearing Plaintiff testify, Dr. Alter testified that he did not hear evidence of profound or significantly subnormal intellectual functioning. In support of this statement, Dr. Alter cited to Plaintiff's testimony which he found to be responsive and coherent though not clearly enunciated, grammatically appropriate, and indicative of comprehension at a very reasonable level. Dr. Alter was impressed with Plaintiff's testimony that he had taken public transportation to his last job, which Plaintiff said he did while filling in for a friend indicating some social network. Dr. Alter noted that Plaintiff got out to do gainful work when he has the opportunity to do so and worked conscientiously on jobs, having never been fired and leaving various past work for understandable circumstances. *Record* at 89-90.

While Plaintiff's score records showed poor grades and work habits as well as significant absences, they also described Plaintiff as "very personable, cooperative," having "good work habits," and being "worldly knowledgeable." *Record* at 198-201.

Plaintiff testified that he worked as a cook at "Berlin Nursing Home" for six months, preparing items on a list, and that he "didn't have no problem with nobody. Everyone got along together." He also testified that he had worked at McDonald's cooking breakfasts for 3 months, worked as a packer for three months, and plucked chickens one summer. All of these jobs preceded his head injury in 1996. *Record* at 76-82. After the injury, and within a year of the October 30, 2002 hearing before the ALJ, Plaintiff did maintenance work for a friend for three months. Plaintiff worked two days a week, cleaning up, mopping the floor and repairing stuff, while his friend's handyman was on vacation. He took the 118 Septa bus to get to his friend's job. *Record* at 86-88.

On August 2002, Plaintiff underwent a consultative examination performed by S.M. Iqbal, Ph.D., a clinical psychologist.  Dr. Iqbal attempted to perform a Wechsler Adult Intelligence Scale, however, he was unsuccessful, concluding that Plaintiff's "behavior and overall functioning made it quite impossible to administer any test."  During his forty-five minute interview, Dr. Iqbal observed three or four instances of "petit mal type of seizures" in which Plaintiff stopped talking and stared in a fixed gaze, or closed his eyes and appeared to be asleep, having to be called two or three times before "he will just wake up."  *Record* at 344-345.  Dr. Iqbal diagnosed Plaintiff as having "organic brain syndrome secondary to brain surgery resulting in confusion, disorientation, and marginal contact with reality," and seizure disorder, with a poor prognosis.  *Record* at 346.

With regard to activities of daily living, Dr. Iqbal stated that Plaintiff was "totally unable" to do any cleaning, shopping, cooking, using public transportation, paying bills, and maintaining his residence and personal grooming or hygiene.  While not a violent person, Dr. Iqbal described Plaintiff as "isolative, does not interact with others."  He found Plaintiff's ability to communicate clearly to be very poor, and his ability to concentrate and attempt any task significantly impaired. Dr. Iqbal concluded that Plaintiff needs constant supervision and that his ability to adapt to stressful circumstances was totally impaired.  *Record* at 346-47.

The ALJ, based on Dr. Alter's opinion, disregarded the petit mal activity reported by Dr. Iqbal as inconsistent with other medical evidence, and unsubstantiated by testing or observation (including the fact that Plaintiff did not display any signs of such activity during the course of the October 30, 2002 hearing).  *Record* at 24.

There is evidence of record to support a finding that Plaintiff's reported IQ score meets the criteria of Listing 12.05C. However, there is substantial evidence of record to sustain the ALJ's finding that Plaintiff does not suffer from mental retardation as the term is used in this listing because there is no showing of significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested before age 22. Thus, based on the record as a whole, I find that the ALJ's conclusion that Plaintiff does not meet Listing 12.05C is supported by substantial evidence.

### 2. Listing 11.02.

To establish disability under Listing 11.02, a claimant must have a documented seizure pattern with seizures occurring more frequently than once a month in spite of at least three months of prescribed treatment. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.02.

In the introduction to Listing 11.00A *Epilepsy*, it states, *inter alia*:

[ . . . ] **Under 11.02 and 11.03, the criteria can be applied only if the impairment persists despite the fact that the individual is following prescribed antiepileptic treatment.** Adherence to prescribed antiepileptic therapy can ordinarily be determined from objective clinical findings in the report of the physician currently providing treatment for epilepsy. Determination of blood levels of phenytoin sodium or other antiepileptic drugs may serve to indicate whether the prescribed medication is being taken. **When seizures are occurring at the frequency stated in 11.02 or 11.03, evaluation of the severity of the impairment must include consideration of the serum drug levels.** Should drug serum levels appear therapeutically inadequate, consideration should be given as to whether this is caused by individual idiosyncrasy in blood absorption of metabolism of the drug. Blood drug levels should be evaluated in conjunction with all the other evidence to determine the extent of compliance. When the reported blood drug levels are low, therefore, the information obtained from the treating source should include the physician's statement as to why the levels are low and the results of any relevant diagnostic studies concerning the blood levels. Where adequate seizure control is obtained only with unusually large doses, the possibility of impairment resulting from the side effects of this

medication must be also assessed. **Where documentation shows that use of alcohol or drugs affects adherence to prescribed therapy or may play a part in the precipitation of seizures, this must also be considered in the overall assessment of impairment level.**

20 C.F.R. pt. 404, subpt. P, app. 1, §11.00A.[4]

With regard to Listing 11.02, the ALJ found that the medical evidence establishes that Plaintiff has a disabling seizure disorder as well as a substance abuse disorder. He further found that, in combination, Plaintiff's seizure disorder, substance abuse, and noncompliance with prescribed medication result in major motor convulsive seizures with loss of consciousness that meet Listing 11.02. *Record* at 25. The ALJ determined that if Plaintiff followed his doctor's instructions by abstaining from alcohol and illicit drug use and by taking the prescribed dosages of his anticonvulsant medication, he would not have an impairment or combination of impairments equal to any listing. *Record* at 28.

At the October 30, 2002 hearing, Dr. Alter testified that the entire record, up until the consultative examination by Dr. Iqbal in August 2002 (where petit mal seizures were noted for the first time), strongly supports major motor seizures at a listing frequency since Plaintiff's head injury in 1996, recognizing the facts of non-compliance with prescribed medications and alcohol and drug abuse as mitigating factors. *Record* at 66-67. Based on the available records, Dr. Alter inferred that Plaintiff had been on continuous, adequate medication for at least three months. *Record* at 60.

---

[4]   The bolded sections above were cited by the ALJ in his November 27, 2002 decision. *Record* at 24.

Dr. Alter also testified that "the majority of the record, except for the most recent evidence, indicates the he was non-compliant [with prescribed medication].  The excuse being that he ran out of medication.  In any event, the blood levels were consistently low up until the most recent period."  *Record* at 60.  It was Dr. Alter's opinion that Plaintiff met Listing 11.02 in terms of the frequency of seizures, but he was engaging in behavior which disqualified him from meeting or equaling this listing.  *Record* at 69.

When asked by the ALJ to opine whether Plaintiff's seizures would occur at frequency equal to that required in Listing 11.02 if he were compliant with his meds and abstained from alcohol and drug use, Dr. Alter stated "Well, that calls for speculation.  One would have to put him to the test."  *Record* at 68.  According to Dr. Alter, it was "not possible to determine from the available medical evidence of record," whether low levels of anticonvulsants and alcohol and/or drug use were contributing to Plaintiff's seizures.  *Record* at 58.  Turning to the last seizure of record, which occurred on March 14, 2002, after Plaintiff "had been drinking over the weekend and smoking pot," the ALJ asked Dr. Alter if this seizure wouldn't have occurred if Plaintiff had not been using drugs and alcohol.  *Record* at 69, 302.  Dr. Alter replied:

> Well, that would call for a medical judgment, and I would judge that it would not have occurred.  That is the assumption.  That's why patients are told not to drink and not to use pot and not to – and to take their medications regularly.  And the purpose of that recommendation – it is know that those factors increase the frequency of seizures.  So the converse I would conclude that he would not meet the listing if he didn't engage in seizure-provoking activity such as not taking medications, drinking, and using pot.

*Record* at 69-70.

The record contains abundant evidence that Plaintiff's blood serum levels were lower than therapeutic levels, and he did fail to take prescribed dosages of medication.  By my count, there were twelve emergency room visits, during the period from August 1996 through March 2002, where Plaintiff's blood serum levels were not in the prescribed range, and/or he admitted to failing to take his dilantin as prescribed.  *Record* at 217-218, 223-224, 226, 234-235, 243-247, 251, 253-259, 265-266, 271-273, 278-279, 295-298, and 335-341.[5]

The record is clearly sufficient to sustain the ALJ's conclusion that Plaintiff did not met the preliminary requirement of Listing 11.00 because he failed to demonstrate compliance with prescribed anticonvulsive treatment.  *See Brown v. Bowen,* 845 F.2d 1211, 1215 (3d Cir. 1988)(finding substantial evidence to support the ALJ's determination that plaintiff, who suffered from a seizure disorder, did not demonstrate compliance with his therapeutic regimen and, therefore, did not meet Listing 11.00).[6]

---

[5]      Alcohol and/or drug use within the last 24 hours was noted, or the presence of alcohol and/or drugs was detected in Plaintiff's blood samples, in half of these twelve emergency room visits.

[6]      In discussing the issue of compliance with prescribed anticonvulsive treatment under Listing 11.00, the Third Circuit distinguished the question of whether the plaintiff would suffer from a disabling seizure disorder if he maintained therapeutic blood drug levels.  *Brown,* 845 F.2d at 1215 n. 6 (3d Cir. 1988).

Plaintiff's argument that the ALJ failed to consider his mental impairments when he determined there is no justification for Plaintiff's failure to follow his treatment regimen raises concerns which are distinct from the question of whether the record supports a finding that Plaintiff failed to comply with prescribed treatment as is required in Listing 11.00.  Thus, I will address this issue in next section in conjunction with the challenge to the ALJ's determination that Plaintiff is ineligible for disability because of his substance abuse.

**B.  Ineligibility Determination Based On Use Of Alcohol/Drugs and Noncompliance.**

The ALJ found that Plaintiff would not be disabled but for his failure to follow the course of treatment his treating physicians have prescribed for his seizure disorder, and that there is no justification for such failure.  The ALJ concluded that Plaintiff is ineligible for disability benefits in accordance with Social Security Ruling 82-59.  *Record* at 29.

The ALJ also found that Plaintiff has a severe substance abuse disorder, and that his substance abuse is a contributing factor material to the finding of disability.  Citing §105 of Public Law 104-121, enacted on March 29, 1996, the ALJ concluded that Plaintiff is ineligible for disability benefits under Title XVI of the Social Security Act.  *Id.*

Social Security Ruling 82-59 states the policy and describes the criteria for finding a failure to follow prescribed treatment when evaluating disability.  It provides, in relevant part, that an individual who would otherwise be found to be under a disability, but who fails without justifiable cause to follow treatment prescribed by a treating source, cannot by virtue of such failure to be found to be disabled. S.S.R. 82-59 (1982).

The Social Security Regulations state that failure to follow prescribed treatment "without good reason" will result in a finding of not disabled.  20 C.F.R. §416.930 (Need to follow prescribed treatment) (2005).  When determining "acceptable reasons for failure to follow prescribed treatment," consideration is to be given to the claimant's "physical, mental, educational, and linguistic limitations."  20 C.F.R. §416.930( c) (2005).

In §105 of Public Law 104-121, Congress amended the statutory definition of disability to read "[a]n individual shall not be considered to be disabled  .  .  .  if alcoholism .  .  .  would .  .  . be a contributing factor material to the Commissioner's determination that the individual is disabled." *Warren v. Barnhart*, 2005 WL 1491012 at *8 (E.D. Pa. June 22, 2005)(*quoting* Contract with America Advancement Act, Pub. L. No. 104-121, §105(a)(1), 110 Stat. 847, 852 (1996)(codified at 42 U.S.C. §423(d)(2)( C)).

The Social Security Regulations explain that if the claimant is disabled and there is medical evidence of drug addiction or alcoholism, it will determine whether the claimant's drug addiction or alcoholism is a contributing factor material to the determination of disability.  The "key factor" in this determination is "whether [the Commissioner] would still find [the claimant] disabled if [the claimant] stopped using drugs or alcohol."  20 C.F.R. §416.935(a)&(b) (2005). The Commissioner must "evaluate which of [the claimant's] current physical and mental limitations, upon which [the Commissioner] based [her] current disability determination, would remain if [the claimant] stopped using drugs or alcohol and then determine whether any or all of [the claimant's] remaining limitations would be disabling."  20 C.F.R. §416.935(b)(2) (2005).

Plaintiff argues that the ALJ erred in failing to consider his mental impairments in determining whether his failure to comply with prescribed medical treatment was without justification, and in finding his alcohol use material to a finding of disability. *Plaintiff's Motion for Summary Judgment* at pp. 15-16, 17-18.

As discussed above, there was clear evidence in the record that Plaintiff did not comply with his medication regime.  There is equally clear evidence that Plaintiff used alcohol and drugs over most of the period covered in the record (July 1995 through March 2002).  In July 1995,

Plaintiff told his treating physician that he was drinking a case of beer a day and using cocaine and marijuana.  *Record* at 306, 325.  In February 1997, Plaintiff was brought to the emergency room after he fell off a bar stool and had a seizure.  The bartender reported that Plaintiff had a beer and a shot before he fell.  *Record* at 254-257.  A July 27, 1998 Emergency Room record reports that Plaintiff admitted to alcohol abuse, but stated that he had not drunk alcohol or smoked marijuana in the last 24 hours.  *Record* at 253.  In September 1998, Plaintiff was again brought to the Emergency Room after having a seizure in a bar at 8:30 a.m.  At that time, Plaintiff admitted to alcohol use but denied drug usage.  *Record* at 246.  In November 1998, and again in July 2000, Plaintiff arrived at the Emergency Room complaining of seizures.  Both times, no ethyl alcohol was detected, and his blood serum level for phenytoin was low.  *Record* at 243-245, 265-266.[7]  From June through December 2001, Plaintiff was seen at the Emergency Room eight times for complaints of seizures; each time Plaintiff had been using drugs and/or alcohol and/or his dilantin level was low.  *Record* at 214-218, 223-224, 226-228, 232, 234-237, 241-242, 271-274, and 278-279.

In June 2001, Plaintiff's discharge diagnosis was "seizure, drug abuse."  *Record* at 240. In July 2001, an ER physician diagnosed a "potential relationship between the [Plaintiff's] seizure and malfunctioning of the [ventriculoperitoneal] shunt.  It is much more likely that the patient, however, is withdrawing from alcohol."  *Record* at 274.  In August 2001, it was noted that Plaintiff's medical history was significant for "seizure disorder and alcohol abuse."  *Record* at 234.

---

[7]        Interestingly, there is no record of medical treatment between November 1998 and July 2000.  There is a report of a neurological consult, dated March 13, 2000, which states that Plaintiff reported drinking alcohol in the past, but stopped about a year ago.  *Record* at 321-22.

Between January 2002 and March 14, 2002, Plaintiff was treated at the Emergency Room six times.  Once he came to the ER to have his dilantin level checked; he left the waiting room before seeing anyone.  *Record* at 213.  A second time, Plaintiff requested that his dilantin prescription be filled; he again left the waiting room before seeing ER personnel.  *Record* at 207.  At one of the remaining four ER visits, Plaintiff's blood levels showed dilantin toxicity, at a second, his phenytoin level was low.  *Record* at 295-298, 335-341.[8]  In 2002, Plaintiff was advised several times to stop drinking alcohol and taking drugs, and to take his seizure medicines as prescribed.  *Record* at 333-334.

Set against this record of alcohol/drug use and noncompliance with his prescribed medication regimen, there is evidence to suggest other possible causes/contributing factors for Plaintiff's seizures.  In addition to the June 2001 notation of a possible malfunction of the ventriculoperitoneal shunt, on August 19, 2001, an ER physician recommended that Plaintiff follow-up with his treating physician "for a possible increase in his Dilantin dose."  *Record* at 235.  At the September 7, 2001 ER visit, Plaintiff reported that his treating physician, Dr. Rosen, was "adjusting his Dilantin levels."  *Record* at 227.  When he was first seen at the ER on September 7, 2001, Plaintiff's dilantin level was within low normal range (10.2).  He was given 300 mg of dilantin by mouth and discharged.  *Record* at 227-228.  Four hours after taking the

---

[8]     When Plaintiff was treated on January 19, 2002, the treating ER physician noted that he reported prescribed treatment levels of anticonvulsant medications which "did not agree with old records on the computer."  *Record* at 295.

additional dilantin, Plaintiff was brought back to the ER after suffering another seizure.  His dilantin level was at 10.0.  Plaintiff was given another 300 mg of dilantin intravenously and discharged.  *Record* at 231.[9]

As discussed above, at the October 30, 2002 hearing, Dr. Alter initially testified that it was not possible to determine on the available medical evidence of record whether the use of alcohol and/or drugs was contributing to Plaintiff's seizures.  He also noted that while there had been a persistent low levels of anticonvulsive medication in the past, the most recent evidence suggested that Plaintiff had adequate levels of anticonvulsants.  *Record* at 58.  When asked by the ALJ to opine whether Plaintiff's seizures would occur at the frequency required in Listing 11.02 if he were compliant with his meds and abstained from alcohol and drug use, Dr. Alter testified that it would call for speculation, but as to the last seizure of record (on March 14, 2002), in his opinion it would not have occurred if Plaintiff had not been using drugs and alcohol. *Record* at 69-70.

Later Dr. Alter testified, when discussing Plaintiff's reported IQ scores:

Well, it is very easy to conclude they [the IQ scores] are low.  Whether they are in the subnormal or in the low normal category is argumentative because two of the three are above 70.  So he's right at the borderline. [ . . . ]
Now these tests, it should be remembered, were obtained before he had the front part of his head damaged by a baseball bat, and that would certainly add to the intellectual – or that would lower his ability to perform even more.  It could also, I might add, interfere with his ability to make reasonable decisions, to plan forward in time.  Frontal lobe injuries characteristically produce that kind of behavioral impairment, and it would be a reasonable assumption in this case that that injury, added to an already borderline situation, giving him the benefit of the doubt, would drop him below a level where he could adequately manage his own affairs

---

[9]     Unfortunately the treatment notes of Dr. Jeffrey Rosen are virtually illegible and do not shed any light as to why Plaintiff's blood drug levels are low.  *Record* at 308-318, 323-325.

and make reasonable plans and perform gainful employment. [ . . . ]
Well, since the brain injury there is no doubt he has not behaved in a way that's in
his own medical best interest or ability to perform in a structured environment as
is required to do a job.  He has not performed – he's consistently in the record not
been compliant with his medication, abuse of drugs and alcohol, and was
instructed in writing, according to the record, not to do that.  Now, maybe he
couldn't afford drugs.  Maybe the drugstore was too far away.  I mean I can
postulate a number of other things which would mitigate the behavior.  But the
simple answer is that that behavior as is documented in the record repeatedly, is
irresponsible.  That's since the injury to the head.  Before that, I'd have to rely on
past history statements.  He was working at one time, but not at a very
intellectually challenging type of occupation.  But we have a vocational expert to
whom I would defer. [ . . . ]
Poor judgment in this case may have a medical basis, as I pointed out due to the
site of the injury and its severity.

*Record* at 71-75.

The ALJ's determination that Plaintiff would not be disabled but for his unjustified

failure to follow prescribed treatment, and because his substance abuse is a contributing factor

material to the finding of disability, is not supported by substantial evidence in the record.  Dr.

Alter, the only expert evidence cited by the ALJ in support of his conclusion that Plaintiff's

substance abuse and failure to comply with medical treatment make him ineligible for disability

benefits, offered conflicting testimony about whether Plaintiff would continue to suffer seizures

if he were compliant with his prescribed medication and if he stops using drugs and alcohol.  He

further testified that Plaintiff's poor judgment in failing to follow medical instructions and in

using drugs and alcohol may have a medical basis, namely his frontal lobe injury.

Remand is appropriate because the record has not been fully developed.  The ALJ did not

evaluate which of Plaintiff's current physical and mental limitations would remain if he stopped

using drugs and alcohol and was compliance with his medication, and did not then determine

whether any or all of his remaining limitations would be disabling.  It is incumbent on the ALJ to

more fully develop the record with respect to the role that substance abuse and/or failure to

comply with prescribed medication therapy may play in precipitating Plaintiff's seizures.

Additional expert testimony and clarification is needed to make a finding as to whether Plaintiff

suffers from a disability independent of his past failure to take his anticonvulsant medication as

prescribed and independent of his substance abuse.  *See Knox v. Barnhart*, 60 Fed.Appx. 374 (3d

Cir. 2003)(not precedential).

### C.  Consideration Of Plaintiff's IQ And Frontal Lobe Injury In VE Hypothetical.

Plaintiff argues that the ALJ erred in not including his IQ and frontal lobe injury in the

hypothetical question presented to the vocational expert.  He further argues that ALJ erred in

finding him disabled according to the grids, which cannot be used to determine disability when

non-exertional impairments are present.  *Plaintiff's Motion for Summary Judgment* at p. 16.

In *Sykes v. Apfel*, 228 F.3d 259 (3d Cir. 2000), the Third Circuit held that the

Commissioner cannot rely solely on the medical-vocational guidelines (grids) when determining

the disability status of claimants suffering from non-exertional limitations.  *Allen v. Barnhart*,

417 F.3d 396, 401 (3d Cir. 2005).  Additional evidence in the form of either vocational testimony

or "rulemaking establishing the fact of an undiminished occupational base" is necessary.  *Id.* at

403 (3d Cir. 2005)(*quoting Sykes*, 228 F.3d at 261 (3d Cir. 2000)).

In the November 27, 2002 decision, the ALJ cited to the grid as a "framework for

decision making."  *Record* at 26.  He stated:

> Based upon an exertional capacity for medium work activity, and the claimant's
> age, education, and lack of past relevant work experience, [ .   .   .   the grid] would
> direct a conclusion of "not disabled."  Although the claimant's additional
> nonexertional limitations would not allow him to perform the full range of
> medium work activity, using the above-cited rule as a framework for decision

making, there are a significant number of jobs in the regional and national economies that he could perform if the effects of substance abuse are not considered, or if the claimant followed his doctor's instructions by abstaining from alcohol and illicit drug use and taking his prescribed dosages of anticonvulsant medication (Section 105 of the Public Law 104-21; Social Security Ruling 82-59).

*Id.*

In addition to citing to the grids, the ALJ did take testimony from a vocational expert at the October 30, 2002 hearing. He asked the following hypothetical question:

[I]f you have a hypothetical individual who was limited to medium exertion level work, who could never climb ladders, ropes or scaffolds, or balance.  Could only occasionally climb stairs.  And would have to avoid concentrated – which is frequent – exposure to excessive noise and vibration.  And fumes, dust, odors, gases, and poor ventilation.  And would have to avoid all exposure to hazards such as moving machinery and unprotected heights.  Would there be medium exertional level, unskilled occupations that would be possible for the hypothetical individual?

*Record* at 92.

In response to this hypothetical, the vocational expert identified the following unskilled medium and light work activity jobs: linen room attendant (medium)(1,000 jobs regionally; 300,000 jobs nationally); hand packager (medium)(5,000 regionally; 800,000 nationally); small products assembler (light)(3,000 regionally; 600,000 nationally); and plastic products assembler (light)(500 regionally; 250,000 nationally).  *Record* at 93-94.

In his hypothetical, the ALJ did not include reference to Plaintiff's IQ score.  The Commissioner argues that the ALJ's hypothetical was not deficient because the ALJ did not find that Plaintiff had significantly subaverage intellectual functioning, a finding that was supported by Dr. Alter's testimony.  *Defendant's Motion for Summary Judgment* [Docket Entry No. 12] at pp. 22-25.

An ALJ's hypothetical must include all of a claimant's impairments that are supported by the record. *Ramirez v. Barnhart*, 372 F.3d 546, 552 (3d Cir. 2004)(a hypothetical which does not include all of a claimant's impairments that are supported by the record is deficient and the expert's answer to it cannot be considered substantial evidence).

The Commissioner is correct in arguing that the ALJ found Plaintiff did not meet the mental retardation listing, and as discussed above, this finding is supported by substantial evidence. However, Dr. Alter testified that Plaintiff's intellectual functioning was, at best, borderline, at "the very lowest end of normalcy." *Record* at 71. After hearing Plaintiff testify, Dr. Alter affirmed his opinion that Plaintiff does not meet Listing 12.05, noting that Plaintiff's testimony indicates that "he functions intellectually well," and did not show evidence of "profound or significantly subnormal intellectual functioning." *Record* at pp. 89-90.

The ALJ's failure to refer to Plaintiff's intellectual limitations in his hypothetical made it deficient. On remand, this impairment, unless refuted by additional evidence, must be included in the hypothetical presented to the vocational expert.

Plaintiff argues that the ALJ also erred in failing to include his frontal lobe injury in the hypothetical. As discussed above, Dr. Alter testified that Plaintiff's frontal lobe injury may affect his intellectual functioning and judgment. On remand, the record must be more fully developed with respect to this issue, and if this impairment is supported by the augmented record, it must be included in the hypothetical presented to the vocational expert.

**RECOMMENDATION**

It is recommended that Plaintiff's Motion for Summary Judgment be GRANTED, and this matter be REMANDED to the Commissioner for further proceedings to augment the record as to the effects of Plaintiff's substance abuse and failure to comply with prescribed medication in precipitating his seizures, focusing on whether Plaintiff suffers from a disability independent from these factors.

  S/ M. FAITH ANGELL
M. FAITH ANGELL
CHIEF UNITED STATES MAGISTRATE JUDGE